Bradbury, J.
The particular ground upon which the circuit court reversed the judgment of the court of common pleas is left in some obscurity by the record. The only statement on the subject is “That the court erred in its charge. ” As the defendant in the court of common pleas excepted to a number of different propositions found in the charge, and also to the court’s refusal to give to the jury certain propositions of law that it presented for that purpose, we are left in doubt as to which of the propositions given or refused the statement in the record refers to. The particular propositions on this subject which the circuit court held to be erroneous not being disclosed, *259 that omission, together with the somewhat wide range taken by the arguments found in the briefs of counsel, renders necessary a more extended consideration of the rules by which damages are to be ascertained in this class- of cases than otherwise would have been pursued. However, the discussion contained in the briefs of counsel and the nature of the controversy lead quite clearly to the conclusion that the rule by which damages should be assessed was the controverted question in this connection. The record discloses no substantial controversy over the facts that establish the defendant’s liability to the plaintiffs under some rule for assessing damages. Nor does any real controversy appear respecting the facts which bear on the rule by which the damages should be assessed.
The defendant, a partnership, was extensively engaged in mining and shipping coai; the mouth of its pit or entry was nearly a mile from the main line of a. common carrier; it had invested large sums of money in constructing entries and tramways into its mines, a coal tipple outside of the mine and in such equipments for transporting coal from the mines to the tipple as is necessary for that purpose. It owned and had mined or was engaged in mining considerable tracts of coal land, that were adjacent to, and surrounded on three sides, the tract in question. This tract could be conveniently, perhaps profitably, mined if the coal could be transported along the tramways of the defendant to the defendant’s tipple. If it could not thus be transported its availability for profitable mining would be doubtful. These entries had already been driven nearly to the line of the tract, a distance of about forty-eight hundred feet from the tipple, and *260 of about three thousand feet from the entrance to the mine. The situation of this tract was such that to have attempted to mine the coal by constructing- and equipping an entry for that purpose would have been of doubtful expediency for a number of reasons. The only outlet was too remote from a common carrier, a stream of water was inconveniently located as respects the points where an entry might be made, the entry would run against the “dip” of the vein of coal, rendering drainage of the mine and transportation of the coal both inconvenient and expensive.
The defendants had in the course of their operations approached quite near to this coal and it could be conveniently mined by them and a way through it to other coal owned by it would be valuable to them but of course worthless to others. The tract of land had belonged to one Hugh Giffin who by will executed in 1881, devised to his wife, Jane Giffin, a life estate therein and at her death the fee to his four children. In the year 1884, the defendant purchased the life estate of Jane Giffin, and soon afterwards twenty-three twenty-eighths of the fee therein, and attempted to purchase of their father the five twenty-eighths that belonged to the plaintiffs. There seems to have been little or no material controversy respecting these negotiations. The plaintiffs are children of Alexander Keys, and an exchange of their interest in this coal for certain surface was effected by him and a representative of the defendant, the terms of which are given by Ross J. Alexander, Esq., then an attorney residing in Belmont county, in a deposition in the following language:
“The children of Mr. Alexander Keys were to receive, in exchange for their interest in this coal, *261 property, about twenty-four acres of land, out of what was called the Falke Section, being surface only the coal underlying the same being reserved. The Falke section had been previously purchased, and was then in the name of Selah Chamberlain, Trustee. Mr. Keys and his children were to ha ye, and did take, immediate possession of this land. Mr. Keys came very often to see me about this coal, not less than a dozen times, I think, and was very anxious to effect the sale of this coal. ” Mr. Keys also testified that he entered into the possession of and had ever since possessed and cultivated the surface which his children were to receive in exchange for this coal.
The general agent of the defendant testified on this subject as follows:
Cross-Examination.
“When he came with Keys you understood that these Keys children were minors?
A. Yes, I knew they were minors.
You knew as a business man that Keys could only sell his own interest as an individual?
A. I knew that Mr. Alexander was representing to me that he was the father of these children, that after this agreement was consummated he was to be appointed guardian, or act as guardian.
You knew, as a business man, that Mr. Keys as an individual had no right to sell any interest except his own?
A. Of course, I knew that.
You knew that, as the father of these children, he had no power to sell their interest?
A. Not as their father.
You knew the only legal way it could be done would be to apply to the probate court and get *262 authority from that court, to make the sale, and then have a sale made, and have it confirmed by that court, you knew that?
A. I thought that was the arrangement made.
You understood that would be necessary?
A. Yes, sir.
And without waiting for that you turned over to Mr. Keys as an individual, this surface land — 24 acres of surface?
A. I do not remember the exact number of acres.
Well, 25 perhaps?
A. Yes, sir.
And you took possession of the coal, or your company did. You did not wait until the transaction in probate court was completed, did you?
A. Ño, sir.
At that time you went to mining your coal you did not know it had been done?
A. I just took Mr. Alexander’s and Mr. Key’s word for it, that the title would be perfect.
You understood you were to get a good title through the action of the probate court?
A. Yes, sir.
And when you got it then you would convey to him the land?
A. Yes, the titles were to be exchanged.
You did not give him a title to the 25 acres of land?
A. Not that I know of.
And you never got a title, you knew that you never had any title for these children’s interest?
A. I reported to Mr. Chamberlain the transaction and asked to have a deed prepared and signed, but never to my knowledge was it done.
As far as your personal knowledge goes you never at any time had any reason to know this land *263 had been conveyed to Keys, and you never saw anything that came through the probate court?
A. I never give it any further attention.
The other deeds from the other Giffin interests, you had it put on record yourself?
A. I do not know whether I had them put on record or whether I had sent them to Mr. Chamberlain and he sent them here.
At any rate you handled the other deeds?
A. Yes, they passed through my hands.
You knew all the time you were taking out this coal that no deed for these children’s interest had passed through your hands?
A. I knew it had not passed through my hands.
You expected it to come to you because you had handled all the other deeds?
A. I was dividing my time so as to attend to my private business and also to look after that railroad work. There was a good deal of work done in the main office in Cleveland, and it might come without my knowing it.
You expected it, you were dealing with Alexander Keys, and you were general agent of the company?
A. Yes, sir.
You expected the deed to be delivered bo you?
A. Yes, I naturally supposed it would be.
You knew it never came to you?
A. I never thought anything more of it.
When you started to mine that coal you knew you did not have a right tc do it when you had not got the deed?
A. I knew I simply had this arrangement with Keys.
Did you not know as a business man when you started to mine that coal that you did not have a *264 right to do it until you got a conveyance through the probate court, and from a guardian?
A. No, I supposed when they had their pay that we had a right to take the coal.
Do you say to the jury that you believed that without making a deed for it, when you turned over this surface land to their father that you had a right to mine their interests in the coal without first getting a deed from the probate court? Do you say that to the jury?
A. I will say that I did not have any doubt but what the deed would be gotten very soon.
Did you not know that would have to be done, and that you had no right to mine it? '
A. I knew the transaction would not be complete until it was done.
Do you say you did not know you had no right to the coal until that was done?
A. No, sir, I did not know that.
Do you say to the jury that you believed that you had a right to take the coal before you had a guardian’s d¿ed for it?
A. I believed we had a perfect right to take the coal under the land.”
Re-Direct Examination.
You had paid for the coal by the exchange?
A. We gave Mr. Keys that land for the children.
Subsequent to that, did Mr. Alexander say in pursuance of that arrangement that he had filed a petition for the purpose of making a legal conveyance?
A. He showed me a petition which he said he was going to file.
Already drawn by him?
A. Yes, sir.
*265 This statement of the evidence is sufficient to show that while, as matter of law, the transaction did not divest the plaintiffs of their ownership of the coal in question, a jury might well have found that it was mined in good faith under a belief that the purchase would be ultimately completed. If the jury had thus found, by what rule should the damages have been assessed?
The court of common pleas in its charge to the jury laid down the rule applicable upon such finding as follows: If “they acted inadvertently under the honest belief that they were entitled to mine it, and to remove and sell it, and convert it to their own use, then in that case, the plaintiff will be entitled to recover the value of the coal immediately after the same was severed from the realty, less the cost of making such severance. If the coal when severed and lying on the floor of the mine is to be considered a chattel jointly owned by the plaintiffs and defendant, the rule of damages thus given by the court is as favorable to the defendant as any which the authorities support.
Further still: A very little reflection on the subject will be sufficient to show that the rule as thus stated does not materially differ from one that Axes as the measure of damages the value of the coal in place. For the value of the coal in place is just equal to its value when severed less the cost of severance. In the very nature of things the only difference between the value of coal in place and that which lies on the floor of the mine is the cost of hewing it. Therefore, if we can fix its value while in place, then by simply adding the cost of severing it, we can ascertain its value when severed. If, on the other hand, any certain rule *266 is shown by which its value when severed and lying on the floor of the mine can be ascertained, then, by deducting the cost of severance we will have its value in place. The real difficulty encountered in this class of cases is in ascertaining the fair value of the coal, or other mineral substance, in place or when severed and lying on the floor, of the mine. If, when in place, or on the floor of the mine, it is immediately accessible to a public highway or common carrier the difficulty is practically overcome, or rather has no existence.
For usually there is no serious impediment met in ascertaining the market value of a commodity that occupies a place in the commerce of the world as important as that filled by fuel coal. And having ascertained its market value, if the coal is so situated with reference to public highways or common carriers that when severed the means of transportation to that market are open to all persons alike and upon equal terms its value in place or on the floor of the mine can be ascertained with reasonable certainty. In the case of coal severed and lying on the floor of the mine its value would be ascertained by deducting from the market price the full cost attending its transportation and marketing, while the value of the coal in place would be the market price less the total expense required to sever, transport and market it.
The coal of the plaintiffs, which was mined by the defendant, however, was not thus situated, when the defendant had extended its entry, and laid a track therein, up to the line which divided its other coal from the coal in question, the means of transportation thus afforded was the private way of the defendant, and any coal that passed along or over it would, be unloaded or dumped at *267 the defendant’s tipple, and pass through or over its screens into the railroad cars in which it was hauled to market. Whether the railroad track on which these cars stood when the screened coal fell into them belonged to the defendant or to a common carrier does not'clearly appear. This, however, is not material to the question for whether this track belonged to the defendant or not the screens and tipple did, as well as the entry and tramway that led from the tipple to the coal, which is the subject of controversy. The means of transportation thus created being the private property of defendants were available to the plaintiffs only upon the consent of the former. Doubtless the circumstance that this entry had been completed added something-to the value of the plaintiffs’ coal.
This increased value, it is true, resulted solely from the expenditure thus incurred by the defendant and rested on the probability that the latter would And it advantageous to its future operations to possess the property and would therefore desire to purchase it. The strength of this desire and consequent value of the plaintiffs’ interest therein would depend to a great extent upon certain conditions of a local character, which are quite apparent to one who is at all familiar with coal mining operations; for instance if the defendant had exhausted the coal already owned by it which could be removed along this entry, and had coal lying beyond this land to which it wished to penetrate and which it could only reach by crossing this land, the value of this coal for immediate mining, together with the value of the right to cross this tract of land to its other coal mig-ht be very great to the defendants and the value of the tract enhanced accordingly; while on the other hand if *268 defendant still had coal in abundance that might be mined and transported through this entry, or even other entries owned by it and could thus continue for a considerable period its mining operations without resorting to this coal its value may not have been materially enhanced by the construction of the entry. The record discloses quite clearly that but for this entry the location of the land is such it cannot be deemed to possess any considerable value for mining purposes. The record discloses further that only a year or two before the defendant began to mine this coal it purchased of Elizabeth A. Forsythe an undivided fourth of these premises for seven hundred dollars, of Nancy M. Giffin an undivided one-fourth for the same price, and of James Giffin an undivided one-fourth for six hundred dollars, aggregating two thousand dollars for three-fourths. For the five twenty-eighths owned by the plaintiffs the defendant was to convey twenty-four or twenty-five acres of surface. . The value of this surface is not stated ' but enough appears in the record to raise a strong inference that it did not exceed five hundred or six hundred dollars. The exact quantity of mineral coal which the land contains is not stated but it seems to have been about one hundred and fifty acres in all; forty-eight and twenty-nine hundredths acres were mined. Just how great a proportion of the coal should be left to support the roof of the mine does not appear, but certainly not more than one-half of the mineral coal had been removed. And of that removed five twenty-eighths only, which equals about eight and one-half acres, belonged to plaintiffs, and yet a verdict for nine thousand five hundred dollars was rendered for them, a sum far in excess of the value of the entire *269 tract, but for this entry, and which could not have been awarded to the plaintiffs if the principle of compensation had been kept steadily in view.
If the defendant acted in good faith, and as we have seen the evidence justified a finding that they did so, they should be held to full compensation but nothing more.
• We are not disposed to question the wisdom of applying to cases of this character that severe rule of damages countenanced by the authorities, where bad faith or a willful disregard of the rights of others is shown. In such cases upon principles of public policy that seek to discourage willful or wanton encroachments on private property, the principle of mere compensation is not followed. The circumstances under which the rule of mere compensation should be disregarded as well as the rules by which compensation itself may be ascertained has long occupied the attention of the courts of this country and of England, and the cases where discussions of its several phases may be found are numerous. Among the more important of them may be classed Martin v. Porter, 5 M. & W., 351; Morgan v. Powell, 3 Q. B., 228; Wild v. Holt, 9 M. & W., 672; Llynvi v. Brogden, 11 L. R. Eq., 188; Jegon v. Vivian, L. R., 6 Ch. Ap., 742; Wood v. Morewood, 3 Ad. & El. (N. S.) 441; N. Ecc. Corns, for England v. Northeastern R. Co., 4 Ch. D., 845; Fothergill v. Phillips, L. R. Ch. D.,770; Hilton v. Woods, 4 L. R. Eq., 432; In re United Merther Colliery, L. R., 15 Eq., 46; Trotter v. McLean, 13 Ch. D., 574; Illinois & St. L. R. & Coal Co. v. Ogle, 82 Ill., 627; Robertson v. Jones, 71 Ill., 405; Maye v. Tappan, 23 Cal., 306; Goller v. Fett, 30 Cal., 481; Barton Coal Co. v. Cox, 39 Md., 1; Forsyth v. Wells, 41 Pa. St., 291; Lyon v. Gormley, 53 Pa. St., *270 261; Waters v. Stevenson, 13 Neb., 157; Stockbridge Iron Co. v. Cone Iron Co., 102 Mass., 86; Austin v. Huntsville Coal & Min. Co., 72 Mo., 535. Many of the cases on the subject were reviewed by Judge Wright in Railway v. Hutchins, 32 Ohio St., 571. In that case, however, trespassers had cut timber from the lands of another and converted it into railroad ties and cord wood, and it is quite evident that the means of transporting the ties and cord wood were as available to the owners as to any one else, so that no difficulty in applying the rule of damages such as occurs in the case before us, arose out of the situation and conditions surrounding the timber after severance. There the wood and ties into which the timber had been converted, rested on the surface of the earth, was on the land of the owner of the timber, and in the nature of things could have been reached by teams and hauled to market direct or to the line of a common carrier. For this purpose the construction of elaborate and expensive entries, tramways and tipples was not necessary. And it is quite apparent that the absence of this necessity enhanced the value of the timber, and that its value, whether as standing trees, felled timber, or manufactured into railroad ties and cord wood, would have steadily diminished in the same ratio that access to it would become difficult, and if situated so as to be practically inaccessible, would possess little or no value whatever. So with the coal lands of the plaintiffs. Before an entry had been extended in their direction, it must be manifest to everyone that their value, owing to their unfavorable situation for the purposes of mining, was comparatively small. Reference has already been made to the effect that may have been produced respecting its *271 value by the defendants extending an entry and tramway from their tipple to the line of this coal. The difficulty of determining this effect, depending as it does upon circumstances the force of which is uncertain, is apparent. In this connection it may be well to advert to the situation the plaintiffs would be in, respecting the coal when severed. To them it was without value except for the probability that defendants would remove it. They could not themselves transport it, or their share of it, over the defendant’s tramway nor could they reach it by an independant, entry ever if that had been in its nature practicable, because the defendants owned twenty-three twenty-eighths of the land through which the entry must have been extended. These considerations show the impracticability of attaining the ends of justice by applying a technical rule of damages to the circumstances of this ease. The Supreme Court commission refused to apply a rule of that character to the circumstances shown in Railway Co. v. Hutchins, Supra (32 Ohio St., 571). The right of property in the ties and cord wood which were the subject of that action while they remained on land where cut or made was in the owner of the timber. By a well established principle the trespassers who felled the trees, and by their labor turned them into cord wood and railroad ties, did not by these unlawful acts transfer the property therein to themselves. The wood and ties remained the property of the owner of the timber, and he could have gone upon his land and hauled them to market, sold them and retained the proceeds. Stil further, if he could have identified them after they had been sold and delivered to the railroad company, he could have reclaimed them in specia if he *272 had desired to do so. This he could do because they were his, and he could not be deprived of his property in them without his consent. The railway by taking and using- them converted them to its own use without his consent. This constitutes trover and by the well settled rules of law the measure of damages is the value of the property. If these well settled rules of law had been technically applied in that case the measure of damages would have been at least the value of the ties and wood when converted to its use by the railroad company. The court there, however, paid more regard to the principle of just compensation than to those technical rules which the owner of the wood and ties sought to have applied; and instead of allowing him in accordance with those technical rules the value of those articles at the time of conversion, limited his compensation to value of the timber as it lay upon the earth immediately after being felled. The principle that underlies this case and those cases which support its conclusions, and upon which all of them rest is that of fully compensating one who has suffered injhry to his property, without doing injustice to others. This case was again before this court in 37 Ohio St., 282, and beginning on page 292, Mclllvaine, J., says, “As we understand the rule laid down by the commission, the value of the timber, as enhanced by the labor of cutting down was the true measure of damages. And surely, as the labor of felling- the trees was a trespass on the real estate of the plaintiff, who has waived the wrong done to his realty, such labor was not an accession to the value of his personal property, which the trees first became after they were cut down and severed from the land. The value at least of the property after it *273 became personal, was the measure of the injury complained of by the plaintiff.”
This rule when applied to the circumstances of that case is reasonable, the mere felling of the trees did not require any appliance beyond an ax, and was an inconsiderable proportion of the labor necessary to convert the timber into either cord wood or railroad ties, and did not extend beyond compensating the plaintiff' for his timber and the trespass which seems to have been willful which had waived, to his real estate.
Judge Mclllvaine in the course of the opinion says further, on page 294, “Indeed it appears to me to be axiomatic, that between man and man, where no wrong-was intended, equal and exact justice is done when the party wronged is made whole for all that he has lost by reason of being deprived of his property.”
If this principle had been pursued in ascertaining the damages suffered by the plaintiffs on account of the coal mined and removed by the defendant a verdict many times greater in amount than the value of the entire coal in place could not have been rendered.
This result could have been accomplished only in one of two ways. (1) Either by applying to the case some technical rule of damages, which though usually applicable to actions of this class, and generally with just results, was in fact inapplicable here by reason of some particular circumstance that distinguished it from its class, or, (2) by a misconception of the principles by which the market value of the coal should have been ascertained.
The court in its instructions to the jury regarded the coal as a chattel from the instant of severance, *274 and authorized the jury to find its market value there, as if no restrictions whatever in respect of its removal existed. It said to the jury that if the defendants acted “inadvertently under the honest belief that they were entitled to mine it (the coal) and remove and sell it, and convert it to their own use, then in that case, the plaintiffs will be entitled to recover the value of the coal immediately after the same was severed from the realty less the cost of severance.”
It also instructed the jury that in considering the case in this view, gentlemen, you are not to consider how much it would cost the plaintiffs to have mined the coal under the circumstances, where it laid; but how much did it cost the defendant to mine it under the circumstances as you may find them from the testimony. And refused to give to the jury each of the following instructions which the defendant requested, to which refusal defendant excepted:
1. If you find from the evidence, that the only place where the vein of coal in question in this case out-crops is at the northwest corner thereof, and you find from the evidence that it is impracticable or expensive to mine and remove the coal by an opening at such place, these facts must be considered as affecting the value of the coal.
2. If you find from the evidence that the defendant mined the coal, believing in good faith it owned it, and that it had reasonable grounds for such belief, and that the defendat had no notice or knowledge of any claim or interest of the plaintiffs, or any of them therein, then the plaintiffs will be entitled to recover the value of the coal in place before it was disturbed.
*275 3. The value of the coal in place, or on the floor of the room, is its market value there, exclusive of the facilities and conveniences afforded by defendant’s passage-ways, tracks, cars, tipples, and other fixtures, in removing it.
It is perfectly clear that when the entry and tramway constructed by defendant was extended up to and touched the line of the coal in question, no right 'to use these means of transportation accrued to the plaintiffs below. True the entry and tramway were there, and that circumstance, as before shown, may have tended to enhance the value of the coal in place, not, however, because the plaintiffs had a right to use them, but because the defendant might want the coal. If the plaintiffs, while their coal was in place, had no right to the use of the facilities for transportation thus belonging to the defendants, how can it be said that such right would accrue to them in ease the defendant in good faith supposing it had bought the coal should sever a portion of it? We think such right would not accrue under those circumstances. If not then the coal thus situated and considered as a chattel would , possess little if any value. Reference to these considerations has been made because they afford an additional illustration of the difficulties that follow an attempt to adjust the rights of these parties by applying to the facts of the case technical rules respecting the measure of damages. Treat the coal as a chattel, hold the acts of the defendants to constitute a conversion of it, and assess the damages as though the owners before and at the moment of its conversion had an unrestricted right to transport it to market although in fact it was totally inac *276 eessible to them. The verdict in this case shows the injustice that may be thus produced.
The only rational course to pursue in such a case as this, where the defendant is a joint owner of the coal in place with the plaintiff, and acts upon the bona fide belief that he has acquired by purchase the interest of his cotenant and has mined it or a portion of it, is to ascertain the full value of the coal in place at the time it was mined. The severing, removing, screening and marketing the coal should be treated as one continued transaction, and the defendant charged with its value at the time he began to mine it. This must be determined by considerations, some of which are quite obvious; as for instance quality of the coal, the thickness of the vein or veins if more than one, its situation with reference to existing facilities, natural or artificial for mining and marketing it. Doubtless other circumstances exist that bear more or less strongly on this question of value in place; but among them should not' be classed the necessity, if any exists, that the defendants may be under to use these lands, after the coal has been exhausted, in its future operations, for a right to such use of the land would not accrue to defendant upon the exhaustion of the coal but by purchase only.
In Hilton v. Wood, 4 L. R. Eq., 432, the value of the coal in place was made the measure of damages against a defendant who had mined it under a belief he was its owner. He had bought of one who had no title, and having mined a part of it, an action was brought against him by its owner to restrain further mining, and for an account of the coal already mined. The syllabus reads: “In assessing compensation for coal already gotten by *277 the defendant, the court being- of opinion that he had worked it inadvertently, and not fraudulently, held that he was only to pay the fair value of such coal as if he had purchased the mine from the plaintiff.” This rule was applied by Parke, B., in Wood v. Morewood, 3d Q. B., 440. The coal in that case had been mined by the defendant under a claim of title that was held invalid in an action to recover its value. Parke, B., “Told the jury that if they found for the plaintiff, they were to determine what damages should be given; that if there was fraud or negligence on the part of the defendant, they might give as damages under the count for trover, the value of the coals at the time .they first became chattels, on the principle laid down in Martin v. Porter; but, if they thought the defendant was not guilty of fraud or negligence, but acted fairly and honestly in the full belief that he had a right to do what he did, they might give the fair value of the coals as if the coal fields had been purchased from plaintiff.”
“The jury adopted the latter estimate, and found for plaintiff, damages £210 per acre.” * *
This rule of damages, in substance, was applied in Jegon v. Vivian, 6 L. R. Ch. Ap., 742.
We cannot say that the court of common pleas erred in saying to the jury that the value of the coal when severed less the cost of severance would be the measure of damages, in case it found the defendant had acted in good faith, because there is in substance no difference between the rule as thus stated and a rule which would fix the measure of damages at the value of the coal in place, for the very simple and obvious reason that the value of the coal in place is just- equal to its value when severed less the cost of severance. The statement *278 of the rule as given by the court doubtless was a principal cause which led the jury to find the excessive verdict rendered by it. Because it was not accompanied by sufficient qualification, the jury was suffered to enter the field of conjecture and speculation without any certain guides by aid of which its conclusions should be reached.
Instead of saying to the jury that “In considering the ease in this view, gentlemen, you are not to consider how much it would cost the plaintiffs to have mined the coal under the circumstances, where it laid; but how much did it cost the defendant to mine it under the circumstances as you may find them from the testimony.”
The court should have said, that the difficulties. attending its mining and transportation by the plaintiffs might be very material in fixing its value. If the principle of compensating them was to be followed; if they were to be given the value of what they had lost, a consideration of all the conditions that surrounded their property and tending to affect its value was material. In this connection and for the foregoing reasons the request No. 1 should have been given. It reads:
If you find from the evidence, that the only place where the vein of coal in question in this case outcrops is at the northwest corner thereof, and you find from the evidence that it is impracticable or expensive to mine and remove the coal by an opening at such place, these facts must be considered as affecting the value of the coal.
In the nature of things the value of the coal would be affected by the circumstances recited in this proposition. The second of the three propositions before referred to, which the court refused to give to the jury, prescribed the rule of damages *279 if the defendants acted in good faith, at “the value of the coal in place before it was disturbed. ” This rule as already shown did not .differ in substance from that given, but it was much easier applied to the circumstances of the case than the one given, where compensation is the end in view, and we think the defendant was entitled to have the question of damages considered from that point of view, and that the verdict was materially affected by the refusal of the court to instruct the jury according to the principle there announced.
The last of the three propositions above noted which the court declined to give, relates to the conveniences afforded by the entry, tramway, etc., constructed by defendants for mining and removing the coal. The proposition denied to the jury the right to consider these facilities and conveniences at all in fixing the damages. This proposition is too broad; for to the limited extent already adverted to, which these facilities and conveniences might enhance the general value of the coal they should be considered. The purpose to be kept in view is that of compensating the plaintiffs for all they have lost, and that compensation should be full, for without their consent their property has been taken. And to accomplish that purpose every circumstance that may tend to increase its value should be regarded as material.

Judgment affirmed.

Williams and Minshall, JJ., dissent.